## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____  )
                                     )
DAVID H. PARKER, Jr.,                )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      Civil Action No. 11-CV-0520 (KBJ)
                                     )
BANK OF AMERICA, N.A.,               )
                                     )
            Defendant.               )
                                     )
_____  )

## <u>MEMORANDUM OPINION</u>

During the severe economic downturn of the last decade, Plaintiff David H.
Parker fell behind in paying his home mortgage.  Parker reached an agreement with the
loan servicer, Defendant Bank of America ("BOA"), to modify his monthly mortgage
payments; however, unbeknownst to Parker, BOA did not implement the terms of the
mortgage modification agreement for nearly two years.  In the interim, Parker received
from BOA a series of foreclosure notices, demands for balloon payments and late fees,
and statements threatening to report his alleged delinquency to credit agencies—none of
which would have happened if BOA had promptly and properly executed the loan
modification agreement.  Parker has filed this civil action against BOA, alleging that
BOA breached and/or tortiously interfered with the terms of his mortgage modification
agreement causing him injury, and that BOA's failure to implement the agreement was
the result of uniform and systematic policies that have injured many other borrowers.

Before this Court at present is a motion for class certification that Parker filed on
March 4, 2014.  Parker seeks to certify a class of borrowers whose valid, binding
mortgage modifications were not implemented by BOA in a timely fashion and who, as

a result, "experienced the acceleration of their full mortgage balances, derogatory credit reporting, and/or late fees." (Pl.'s Mot. to Certify the Class, Mot. to Appoint Class Counsel, and Mot. to Appoint Class Representative ("Pl.'s Mot."), ECF No. 62, at 3.)[1] BOA opposes Parker's class certification motion on the grounds that, regardless of the merits of Parker's individual claim, Parker has failed to establish that BOA breached or tortiously interfered with valid, binding mortgage loan modification agreements on a classwide basis.

On March 31, 2014, this Court entered an order that, among other things, **DENIED** Parker's motion for class certification.  (Order, ECF No. 86.)  In the instant Memorandum Opinion, the Court explains the reasoning behind that ruling.  In short, this Court has concluded that Parker has failed to satisfy the commonality requirement of Federal Rule of Civil Procedure 23(a) because he has not demonstrated that BOA systematically applied common policies or practices to the mortgage modification agreements it entered into with borrowers in a manner that breached those contracts systemically and thereby injured each putative class member in a similar way. Consequently, class certification is not appropriate.  The Court has also determined that Parker's related motion to exclude the testimony of BOA's fact witness Michael Sunlin should be **DENIED** because the record evidence does not support the assertion that Sunlin's testimony is improper and should be stricken.  In addition, having denied Parker's motion for class certification on commonality grounds, the Court also **DENIED AS MOOT** and without prejudice the remaining motions to strike and/or to exclude certain evidence that both parties filed to bolster their other class certification

---

[1] Page numbers throughout this Opinion, with the exception of deposition page numbers, refer to those that the Court's electronic filing system assigns.

arguments—these motions can be refiled if the same evidentiary issues arise in the context of Parker's individual claim.

## I.     BACKGROUND

### A. Facts Regarding Parker's Mortgage Modification

David Parker is a firefighter with the District of Columbia Fire Department and a District of Columbia resident.  (Am. Compl., ECF No. 19, ¶¶ 10, 15.)  Parker purchased a piece of real estate in the District in 1999, and he currently has two mortgages on that property.  (Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem."), ECF No. 62, at 17.) Fannie Mae owns Parker's first mortgage—which is the loan at issue here—and BOA services that mortgage loan. (*Id.*)[2]

In 2008, Parker suffered a number of personal hardships that made it difficult for him to keep up with the monthly mortgage payments, including his wife's discharge from her job and his having to pay considerable additional expenses related to his mother's funeral.  (*Id.*)  Parker contacted BOA to request a modification of his mortgage loan payments, and Parker and BOA commenced a process designed to result in the modification of the mortgage loan's terms.  (*Id.* at 17–18; Am. Compl. ¶ 16.)[3] The modification under consideration in Parker's case reduced Parker's monthly mortgage payments by over $400—from $1,761.62 a month to $1,342.74.  (Pl.'s Mem. at 18.)

---

[2] A mortgage servicer manages loans owned by third parties (hereinafter referred to as "noteholders") in exchange for a servicing fee and ancillary fees such as late fees charged to a borrower.  *See* Mortg. Bankers Ass'n, Residential Mortgage Servicing in the 21st Century 5 (2011).  Parker's noteholder, Fannie Mae, is not a party to this case, and the identities of the various noteholders of the putative class members are irrelevant to the instant class action motion.

[3] BOA is the successor by merger of BAC Home Loan Servicing, LP, which was formerly known as Countrywide Home Loans Servicing LP.  BAC was the initial Defendant in this lawsuit; for the purpose of this opinion, Parker's loan servicer is hereinafter referred to as "BOA."

In the summer of 2009, BOA approved Parker's loan modification, and sent him a letter dated July 11, 2009, stating that "[i]n order for the modification to be valid, the enclosed documents need to be signed and returned." (Ex. 7 to Pl.'s Mot., ECF No. 60-13, at 6.) The letter specified that Parker's "new modified monthly payment will be $1,342.74, effective with your September 1, 2009 payment." (*Id.*) The letter also clarified that Parker's interest rate was being reduced from the then-existing market rate of 6% to a "new reduced rate of 4.000%[,]" which would "be effective as of the September 1, 2009 payment." (*Id.*) In addition, the letter specifically instructed Parker to "sign, date, and return one (1) complete set of enclosed documents to us in the re-usable Fed-Ex envelope . . . no later than August 10, 2009[,]" and it warned that "[i]n the event that you do not or cannot fulfill ALL of the terms and conditions of this letter no later than August 10, 2009, we will continue our collections actions without giving you additional notices or response periods." (*Id.* at 8.)

Parker duly signed and returned the documents, which included copies of the modified mortgage agreement, as instructed. (Pl.'s Mem. at 19.) Parker also called BOA and received confirmation that his documents had been received. (Am. Compl. ¶ 18.) Shortly thereafter, Parker received additional correspondence from BOA, including "documents welcoming him into Defendant's modification plan on a permanent basis[.]" (*Id.* ¶ 19.) Parker began making payments in accordance with the modified terms of the mortgage agreement as of September of 2009. (Pl.'s Mem. at 18.)

Notably, the first mortgage statement that Parker received from BOA after the effective date of his modification agreement did not reflect the change to his loan payment terms. (*Id.* at 19.) However, the statement did include prominent language to the effect that if the borrower and BOA "have entered into an agreement to address [the

borrower's] monthly payments, *please make payments in accordance with this agreement.*" (Ex. 8 to Pl.'s Mot., ECF No. 60-14, at 2 (emphasis added).)  Every mortgage statement that arrived in Parker's mailbox thereafter would similarly fail to reflect the modified terms, but the statement would also include this language indicating that the borrower should assume that the modification is in effect and should pay in accordance with the modified mortgage agreement.  (Pl.'s Mem. at 19.)

On August 2, 2010, nearly twelve months after the modification agreement supposedly had taken effect, Parker received a "Notice of Intent to Accelerate" from BOA.  (*Id.* at 22.)  This letter informed Parker that he was "in serious default" on his mortgage payments, to the tune of more than $23,000.  (Ex. 12 to Pl.'s Mot., ECF No. 60-18, at 2.)  A week later, Parker received a second "Notice of Intent to Accelerate," and that notice contained a slightly lower calculation of payments due, but still demanded more than $22,000.  (*Id.* at 4–5.)  The amounts in both letters approximated what Parker would have owed if there had not been any modification agreement at all.  Furthermore, as another indication that his loan modification agreement was not in effect, Parker received from BOA on August 27, 2010, a proposal to modify the terms of his mortgage loan, and the suggested modification proposed a higher monthly payment amount than the amount Parker was paying pursuant to the 2009 modification agreement.  (*See* Ex. 14 to Pl.'s Mot., ECF No. 60-20, at 2; Pl.'s Mem. at 23.)  Parker also received a letter dated October 6, 2010, from a law firm representing BOA that threatened foreclosure if Parker did not make the required payments.  (*See* Ex. 13 to Pl.'s Mot., ECF No. 60-19.)

Through all this, Parker repeatedly contacted BOA in an attempt to clear up the apparent misunderstanding regarding the effective terms of his mortgage loan.  When

Parker first contacted BOA in August of 2010, a BOA representative denied the existence of a modification agreement. (Am. Compl. ¶ 23.) Parker contacted BOA once again in October of 2010, and thereafter he received a letter informing him that, if a modification agreement existed, BOA was not able to locate it. (Ex. 15 to Pl.'s Mot., ECF No. 60-21.) Parker persisted in making monthly payments in accordance with the terms of the 2009 modification agreement until November of 2010, when BOA rejected his payment entirely because his mortgage was considered delinquent. (Am. Compl. ¶¶ 26, 29, 31; Pl.'s Mem. at 24.)

## B. Procedural History

On February 8, 2011, Parker filed suit in District of Columbia Superior Court seeking to enforce the terms of the agreement that he had made with BOA regarding modification of his mortgage loan payments. Parker's initial complaint alleged breach of contract claims and similar claims that pertained only to his own mortgage modification experience. BOA removed the case to federal court on diversity and federal question grounds (*see* Notice of Removal, ECF No. 1), and on July 20, 2011, Parker was permitted to amend his complaint (*see* Order, ECF No. 18). In so doing, Parker raised the possibility of classwide claims for the first time. (*See* Am. Compl. ¶¶ 58–65.)

Parker's amended complaint contained four separate counts against BOA: breach of contract (Count I), tortious interference with contract (Count II), and two violations of the Fair Debt Collection Practices Act (Counts III and IV). (*Id.* ¶¶ 66– 109.) BOA moved to dismiss Counts II, III, and IV shortly after the amended complaint was filed (*see* Def.'s Mot. to Dismiss Counts Two, Three, and Four of Pl.'s Am. Compl., ECF No. 23), and the Court granted BOA's motion to dismiss the Federal Debt

Collection Practices Act claims (Counts III and IV), but denied BOA's motion to dismiss the tortious interference with contract claim (Count II), *see Parker v. BAC Home Loans Servicing LP*, 831 F. Supp. 2d 88, 94–95 (D.D.C. 2011) (Boasberg, J.). Following this ruling, BOA filed an answer to Parker's amended complaint (Am. Answer, ECF No. 40), and the parties entered into class-certification-related discovery, which lasted until November of 2013.

Parker filed a motion for class certification on March 4, 2014.  Parker's motion requests certification of two classes—one under Federal Rule of Civil Procedure 23(b)(1)(B) and the other under Rule 23(b)(3)—and the requested class definition is the same for both proposed classes:

> (a) All current and former borrowers of residential mortgage loans since August 1, 2008, (b) across the United States of America (c) whose loans were serviced by Defendant BOA, N.A., (d) were coded "Complete" (e) and who despite having paid on time, in full thereunder, (f) experienced the acceleration of their full mortgage balances, derogatory credit reporting, and/or late fees.

(Pl.'s Cert. Mot. at 3.)[4]  Parker's class certification motion has now been fully briefed (*see* Def.'s Opp'n to Pl.'s Mot. ("Def.'s Opp'n"), ECF No. 68; Pl.'s Reply in Supp. of Pl.'s Mot. ("Pl.'s Reply"), ECF No. 77), and in addition, the parties have filed and briefed motions seeking to strike or exclude various witnesses that each side has identified in support of their respective positions regarding class certification.[5]  This Court held a hearing on all of the pending motions on December 16, 2014.

---

[4] Parker's class certification motion suggests that he is seeking the certification of two classes with identical definitions under two different certification rules in order to be able to recover punitive damages on a classwide basis.  (*See* Pl.'s Mem. at 3, 80.)

[5] The parties have, collectively, proffered four expert witnesses with respect to class certification, and Defendant BOA has also presented additional fact witnesses. At this point, a motion to exclude is pending with respect to each expert witness and also one of BOA's fact witnesses.  BOA has filed a single motion requesting that all three of Parker's expert witnesses be stricken.  (*See* Def.'s Mot. to Strike the Purported Expert Witness Reports of Keshav Raghunathan, Mark Riley, and Dean Binder,

### C.  BOA's Mortgage Modification Process

Significantly for present purposes, the parties' class certification briefs present strikingly different assertions of fact regarding BOA's mortgage modification process. Because there is such stark disagreement about whether, and to what extent, BOA applies a standardized process in a systematic way when it implements loan modification agreements—an issue of fact that lies at the heart of the instant class certification dispute—a brief description of the parties' widely differing views of the applicable mortgage modification procedures is warranted.

### 1.  Parker's View:  BOA Uniformly Implements A Staged Post-Modification Review Process

According to Parker, after BOA receives a signed modification agreement back from a borrower, two significant and uniform internal processing steps occur.  First, BOA reviews the executed agreement to ensure that any conditions precedent to the modification—conditions such as the submission of additional documentation, income verification, or resolution of bankruptcy issues—have been satisfied.  (*See* Pl.'s Reply at 7–9.)  If so, according to Parker, BOA will mark that borrower's electronic file "Completed."  (Pl.'s Mem. at 28.)  Parker attributes substantial significance to the "Completed" designation because, in Parker's view, any account that has been coded as "Completed" is an account in which the borrower and BOA have both consented to the terms of the modification agreement and have fulfilled any conditions precedent such that there is a binding contractual agreement.  (*Id.* at 29 n.12; *see also id.* at 28 (emphasizing one internal BOA document that appears to define the term "Completed"

---

ECF No. 67.)  Parker has filed two separate motions, one that seeks to exclude the testimony of BOA's one expert witness (*see* Pl.'s Mot. In Limine to Exclude Test. of David Skanderson, ECF No. 79), and another that seeks to exclude the testimony of BOA's fact witness Michael Sunlin (*see* Pl.'s Mot. In Limine to Exclude Test. of Michael Sunlin ("Pl.'s Mot. to Strike Sunlin"), ECF No. 78).  The parties' three evidentiary motions have been fully briefed.

as meaning "[f]iles that have accepted an offer, a decision has been made, agreed by all parties and correctly executed documents have been returned by the customer").

Parker maintains that after a file has been marked "Completed," BOA moves on to a second uniform procedural step:  it engages in what Parker calls a "Post Loan Modification Review."  (*See id.* at 33.)  This process allegedly involves a review of the binding modification agreement by BOA in order to determine whether there have been any errors in the making of the agreement.  (*See id.*)  Parker contends that there are two basic errors that BOA looks for during the Post Loan Modification Review: (a) an accounting or mathematical error, such as a miscalculation of how much principal remains or of what the borrower's monthly payments will be, or (b) a violation of the noteholder's rules.  (*Id.* at 34–35.)[6]

According to Parker, if no errors are detected during the Post Loan Modification Review, BOA ensures that the borrower's electronic file reflects that fact by changing the "Warning Code" in the borrower's account to "0."  (*Id.* at 34.)  Then, according to Parker, that borrower's file is "returned to normal servicing[,]" meaning that the terms of the modification agreement are put into effect.  (*Id.* at 32–33.)  But, says Parker, if one of the aforementioned errors is identified as part of the Post Loan Modification Review, BOA will not change the borrower's Warning Code to "0" and the borrower's file will not be returned to normal servicing.  (*Id.* at 35.)  Instead, with respect to

---

[6] As noted earlier, *see* footnote 2, *supra*, the mortgage servicer is an agent of a noteholder.  As such, the servicer's ability to manage a mortgage is subject to rules that the noteholder imposes, and one of the primarily responsibilities of a mortgage servicer is to offer modifications to borrowers in accordance with the noteholder's rules.  (*See* Dep. of Charles Kelly ("Kelly Dep."), Ex. 21 to Pl.'s Motion, ECF No. 60-27, at 62:24–63:2 (noting examples of noteholder rules for modifications such as "can't modify more than once every two years" or "not allowed to reduce a payment by X% or an interest rate by X%").)  It is undisputed that, if a mortgage servicer breaches a noteholder's rules for modifying a contract, the noteholder might impose a fine on the mortgage servicer or force the mortgage servicer to purchase the modified loan from the noteholder.  (*See id.* at 133:24–25, 136:5–8.)  Parker alleges that BOA engages in a Post Loan Modification Review partly to avoid this result.  (*See* Pl.'s Mem. at 42.)

borrowers who find themselves in this circumstance, BOA will intentionally refuse to execute the borrower's mortgage modification agreement despite the fact that a valid and binding contract exists, and BOA may even propose to the borrower a *new* modification agreement, usually on worse terms than the original agreement.  (*See id.* at 35–36; *see also* Dep. of John Goodrum ("Goodrum Dep."), Ex. 19 to Pl.'s Mot., ECF No. 60-25, at 80:17–21 (speculating that the 2011 modification proposal that was sent to Parker was likely in response to BOA's rejection of the earlier modification).)

According to Parker, at least two separate injuries to the borrower occur as a result of BOA's failure to effectuate the terms of a modification agreement if errors are detected during the Post Loan Modification Review, both of which Parker asserts require classwide compensation.  First, BOA's failure to implement the terms of a modification agreement leads to the imposition of allegedly inappropriate and unlawful late fees.  (*See* Pl.'s Mem. at 89–90.)  Such fees are imposed as a consequence of BOA's standard policy of not crediting partial payments as timely; specifically, Parker asserts that if the mortgage modification is not made effective as a result of the Post Loan Modification Review and the borrower unwittingly pays the lower modification amount on time in accordance with the modified mortgage agreement, such payment is reflected as an untimely partial payment in BOA's internal systems and late fees are incurred.  (*See id.*)  The second injury, Parker says, is the fact that BOA's failure to implement a modification agreement damages a borrower's credit score.  (*See id.* at 44–46.)  For example, Parker claims that he was injured because, although he was making prompt payments in accordance with the modification agreement, BOA did not acknowledge his payments as being made in satisfaction of the modified mortgage

agreement and was simultaneously filing credit reports that falsely stated that Parker

was behind on his mortgage payments.  (*Id.* at 44.)

   2.   BOA's Position:  A Mortgage Loan Modification Is A Customized Process
        Tailored To Each Borrower's Particular Circumstances

BOA vehemently denies that it engages in *any* uniform process when it enters

loan modification agreements with borrowers, much less the systemic two-stage post-

modification review process that Parker relies upon in support of his class certification

request.  Instead, according to BOA, its mortgage modification programs involve a

highly individualized assessment of each borrower's mortgage loan terms and

circumstances, and whether or not an enforceable modification agreement is ever

reached "depends upon an array of contractual conditions which differ from borrower to

borrower depending on the terms of the loan, the modification program, the time period,

and other factors."  (Def.'s Opp'n. at 13; *see also id.* at 25 (maintaining that "there is

*enormous* variation in the contractual language used in the million-plus modification

agreements Bank of America has completed over the last 5 ½ years" (emphasis in

original)).)

BOA also takes direct aim at the twin linchpins of Parker's argument that class

certification is appropriate in this case, to wit—(1) Parker's assertion that BOA marks a

borrower's file "Completed" once it has determined that all of the contractual

conditions are satisfied and a binding agreement has been formed, and (2) Parker's

contention that, after such a binding contract is formed, BOA undertakes a review for

errors that can, and does, result in the binding loan modification not being put into

effect.  First, in direct contrast with Parker's position, BOA maintains that there is no

legal significance whatsoever to a borrower's file being coded "Completed" in BOA's

internal systems, and that this designation has no bearing on BOA's own view of

whether a valid modification agreement has been formed.  In this regard, BOA points to a later version of the same document that Parker relies upon to establish the meaning of "Completed," and this later version states merely that "[t]he completed status is how the associates are aware that the customer successfully returned the agreement."  (*See* Ex. 15 to Def.'s Opp'n, ECF No. 63-36, at 19.)  Thus, according to BOA, a "Completed" designation simply reflects that a borrower's application is at a particular stage of the modification process, not that there is necessarily a binding modification contract at that point in time.  (*See* Def.'s Opp'n at 18 (explaining that the "Completed" status "has meant different things at different times, as Bank of America's policies and IT systems have evolved, but it has never meant that the parties have reached a 'binding agreement' or that a loan must be modified").)

BOA additionally asserts that there is simply no such thing as the "Post Loan Modification Review" stage of BOA's mortgage modification process; it charges that Parker has invented the notion that BOA has any sort of uniform review policy when processing loan modifications entirely out of whole cloth.  (Def.'s Opp'n at 19; *see also id.* at 44 ("Lacking anything in the record to suggest any such policy exists, Plaintiff made one up.").)  BOA admits that there are processes that it follows when modifying mortgage loans; however, BOA contends that these processes differ according to the type of loan, the identity of the noteholder, the type of modification sought, and when the modification is sought.  (*Id.* at 19–21.)  Moreover, as to the two types of "errors" that Parker says are identified at this alleged second stage of the modification process, BOA acknowledges that errors sometimes are made in the loan modification process, as with any other complicated transaction, but maintains that these errors are resolved in any number of ways, without application of any uniform policy.  (*Id.* at 20.)  BOA also

asserts that it does not engage in a review of a modification agreement to ensure compliance with noteholder rules after that agreement is executed (*id.* at 21), and that, in any event, BOA's approach to late-discovered errors is not to prevent the loan from being serviced in accordance with the modification but "to take whatever steps are necessary to resolve the issue so that the loan can be returned to normal servicing" (Def.'s Opp'n at 23 (emphasis omitted))—steps that BOA says vary from case to case.

In sum, whereas Parker contends that BOA follows a standardized process for loan modifications pursuant to which each modification agreement goes through at least two common steps, BOA presents a portrait of a mortgage modification process that is specific to the characteristics of the individual borrower, and that changes over the prescribed class period.  In light of this dispute, the primary issue for this Court in ruling on Parker's motion for class certification is whether Parker has satisfied his burden of demonstrating that BOA's failure to implement the loan modification agreement in his individual case derives from a policy or practice that BOA has applied consistently with respect to other borrowers' mortgage modification agreements and that has resulted in injuries to other borrowers such that Parker's suit can properly proceed as a class action.

## II.    CLASS CERTIFICATION MOTIONS

### A. Federal Rule of Civil Procedure 23(a)

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (internal quotation marks and citation omitted).  The Federal Rules of Civil Procedure specifically delineate the requirements that must be satisfied in order for a court to conclude that the exceptional class action litigation procedure is

warranted.  First and foremost, every class action must satisfy four basic requirements

that are set forth in Rule 23(a) of the Federal Rules of Civil Procedure:

> (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law or fact common
> to the class; (3) the claims or defenses of the representative
> parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a).  These four requirements are referred to colloquially as

numerosity, commonality, typicality, and adequacy of representation.  *Amgen Inc. v.*

*Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).  Moreover, in addition

to these four requirements, there is an "implied requirement" that the proposed class

must be definite and ascertainable.  *Thorpe v. District of Columbia*, 303 F.R.D. 120,

139 (D.D.C. 2014).  These threshold requirements are mandatory:  if any is not

satisfied, then a class cannot be certified.

 Among these threshold requirements, the "commonality" mandate has caused

considerable confusion, stemming partly from the fact that whether or not common

questions of law or fact that can support a class action exist relates largely to the

underlying claims that are being brought.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S.

Ct. 2541, 2545 (2011) (explaining that the relevant "common" question is "an issue that

is central to the validity of each one of the claims").  So for example, where, as here,

the plaintiff contends that the defendant has engaged in widespread and systematic

breaches of contract and tortious interference with contracts that can be addressed on a

classwide basis, the plaintiff must, at a minimum, offer evidence that the class members

have in common the elements of those claims—*e.g.*, for breach of contract, that there is

"(1) a valid contract between the parties; (2) an obligation or duty arising out of the

contract; (3) a breach of that duty; and (4) damages caused by breach."  *Tsintolas*

*Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009) (citation omitted); *see also Casco Marina Dev., LLC v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 83 (D.C. 2003) ("[T]he elements of tortious interference with contract are:   '(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach.'" (quoting *Paul v. Howard Univ.*, 754 A.2d 297, 309 (D.C. 2000))).[7]  Moreover and in this regard, a factor to consider when deciding whether a breach of contract claim can properly proceed as a class action is whether the terms of the putative class members' contracts are relatively uniform such that the circumstances of the alleged breach are virtually identical or, alternatively, whether there are material differences in the contract terms that will necessitate individual review of each contract and the circumstances under which it may have been breached.  *Compare In re Cablevision Consumer Litig.*, No. 10-cv-4992, 2014 WL 1330546, at *6–8 (E.D.N.Y. Mar. 31, 2014) (finding presence of standard form contracts satisfies commonality), *with Spread Enters. v. First Data Merch. Servs. Corp.*, 298 F.R.D. 54, 72–73 (E.D.N.Y. 2014) (finding material differences in contractual terms defeats commonality).

In the relatively recent landmark case of *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court provided substantial guidance regarding what a movant seeking certification of a putative class action must do to satisfy Rule 23(a)'s commonality requirement.  *Wal-Mart* involved a class certification petition filed on behalf of millions of current and former Wal-Mart employees in the context of a lawsuit that alleged that

---

[7] Because Parker has requested a nationwide class action, application of the laws of all fifty states would be required to assess true commonality.  *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3)."). This Court will assume for the purpose of the instant motion that the basic elements of a breach of contract action are the same in every state, as Parker asserts.  (*See* Pl.'s Mem. at 98–100.)

Wal-Mart had engaged in a pattern or practice of gender discrimination in violation of Title VII. The Supreme Court explained that common questions such as "Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? [and] Is that an unlawful employment practice?" were insufficient to establish commonality for Rule 23(a) purposes because Title VII "can be violated in many ways" and "[c]ommonality requires the plaintiff to demonstrate that the class members have *suffered the same injury*[.]" *Wal-Mart*, 131 S. Ct. at 2251 (emphasis added) (internal quotation marks and citation omitted). Thus, the relevant commonality criterion is not merely whether members of the putative class "have all suffered a violation of the same provision of law" but whether the legal action is based upon "a common contention" that "is capable of classwide resolution" because its establishment "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*; *see also id.* ("[T]he mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.").

In the context of the claims being made in the *Wal-Mart* litigation, the Supreme Court determined that one such common contention—*i.e.*, the "glue" that had the potential of "holding the alleged reasons for the [challenged employment] decisions together"—was the plaintiffs' assertion that Wal-Mart "engages in a pattern or practice of discrimination." *Id.* at 2552 (emphasis omitted); *see also id.* at 2553 (explaining that an allegation "'that an employer operated under a general policy of discrimination conceivably could justify a class . . . if the discrimination manifested itself in hiring and promotion practices in the same general fashion'" (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 n.15 (1982)).). Accordingly, the *Wal-Mart* Court clearly

emphasized that is not enough that a class certification motion raises common *questions*; what matters is "'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* at 2251 (emphasis in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

The D.C. Circuit has recognized that the Supreme Court's *Wal-Mart* analysis extends beyond the Title VII context. *See DL v. District of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013) (noting that "*Wal–Mart*'s interpretation of Rule 23(a)(2) has changed the landscape"). For example, the Circuit decided that an allegation that the District of Columbia government had violated the Individuals with Disabilities Education Act ("IDEA") with respect to a putative class of students who allegedly had been discriminated against in a variety of ways "speaks too broadly because it constitutes only an allegation that the class members 'have all suffered a violation of the same provision of law,' which . . . is insufficient to establish commonality given that the same provision of law 'can be violated in many different ways.'" *Id.* (quoting *Wal-Mart*, 131 S. Ct. at 2551). Thus, binding precedent in this jurisdiction establishes that a plaintiff must allege that the "policy or practice affects all members of the class" in the same way to establish commonality, and that anything less "is not faithful to the [Supreme] Court's interpretation of Rule 23(a)[.]" *Id.*

## B. Federal Rule of Civil Procedure 23(b)

Beyond the initial requirements of Rule 23(a), there are also additional certification requirements that vary depending on the type of class the plaintiff wishes to have certified. The instant action involves a request for certification under Rules 23(b)(1)(B) and 23(b)(3).

Rule 23(b)(1)(B) generally permits certification if there is a risk that separate actions by individual class members will lead to binding adjudications of the rights of other individuals.  *See* Fed. R. Civ. P. 23(b)(1).  "Classic examples" of when certification under Rule 23(b)(1)(B) is appropriate include "actions by shareholders to declare a dividend" or "actions charging a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of beneficiaries[.]" *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 833–34 (1999) (internal quotation marks and citations omitted).

A Rule 23(b)(3) class is appropriate where the movant can establish that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) "allows class certification in a much wider set of circumstances" than permitted by the other subsections of Rule 23(b) "but with greater procedural protections[.]"  *Wal-Mart*, 131 S. Ct. at 2558.  Class actions under Rule 23(b)(3) require that all class members receive a notice informing them of the nature of the case and their right to opt out.  *See* Fed. R. Civ. P. 23(c)(2).

### C.  Standard Of Proof

Class certification motions have their own distinct burdens and fact finding requirements.  The D.C. Circuit has not yet spoken to the precise burden of proof applicable to establishing that the requirements of Rule 23 have been met; however, courts in this Circuit have routinely applied a preponderance of the evidence standard. *See In re Navy Chaplaincy*, No. 07-mc-269, 2014 WL 4378781, at *9 (D.D.C. Sept. 4, 2014) ("The proponent of class certification must prove by a preponderance of the

evidence that the requirements of Rule 23 are satisfied."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 22 (D.D.C. 2012) ("Although the D.C. Circuit has not yet had occasion to provide much guidance on these questions . . . the Court concludes . . . that it should apply a preponderance of the evidence standard of proof[.]" (internal citations omitted)), *vacated on other grounds*, 725 F.3d 244 (D.C. Cir. 2013). Further, courts are permitted to make factual findings to the extent necessary to rule on a motion for class certification. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. at 22. ("[T]he Court concludes . . . that it can and must resolve any factual disputes relevant to the requirements for class certification—even if that requires considerations enmeshed in the factual and legal issues comprising plaintiffs' claim on the merits[.]"); *see also Artis v. Yellen*, No. 01-cv-400, 2014 WL 4801783, at *7 n.11 (D.D.C. Sept. 29, 2014) ("[P]laintiffs wrongly assert that they are entitled to have a jury determine the facts at this stage.  A jury may be the ultimate fact finder, but 'at the class certification stage . . . the judge is the decision maker.'" (alteration in original) (internal citations omitted) (quoting *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011))).

Notably, when the commonality element of a class certification motion hinges on the plaintiff's contention that the defendant has engaged in a policy or practice that has consistently and uniformly injured the putative class members, the plaintiff must provide "*significant proof*" that such a policy or practice exists.  *Wal-Mart*, 131 S. Ct. at 2553 (emphasis added).  In other words, the movant must do more than merely *allege* a common contention that conceivably could give rise to the conclusion that there has been the same classwide injury; he must support that allegation with significant evidence.  *Id.* at 2553; *see also id.* at 2251 ("Rule 23 does not set forth a mere pleading

standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.").  Although it appears that "[c]ourts have taken different views of whether *Wal–Mart*'s significant proof standard applies to all class certification decisions or only to claims alleging systemic discrimination[,]" *Parsons v. Ryan*, 754 F.3d 657, 684 n.29 (9th Cir. 2014), Parker has not argued that the "significant proof" standard applies only to actions alleging a general policy of discrimination, and this Court sees no reason to make any such distinction.  Consequently, this Court agrees with those cases that have held that the "significant proof" standard applies where, as here, a movant seeks class certification based on classwide injuries allegedly caused by a general policy or practice.  *See Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 498 (7th Cir. 2012) (applying the "significant proof" standard to a class action arising under the IDEA); *NBL Flooring, Inc. v. Trumbull Ins. Co.*, No. 10-cv-4398, 2014 WL 615967, at *3 (E.D. Pa. Feb. 12, 2014) (applying the "significant proof" standard to a breach of contract class action).  Accordingly, when a plaintiff seeks class certification based on an allegation that a defendant has a policy or practice that results in the systematic breach of binding contractual agreements, the plaintiff must support his certification motion with significant evidence that such policy or practice exists.  *See, e.g., NBL Flooring, Inc.*, 2014 WL 615967, at *3.

## III.   ANALYSIS

As explained above, in order for Parker to establish that his breach of contract and tortious interference claims raise common questions of law and fact that are suitable for class certification under Rule 23(a), Parker must provide significant proof

that BOA engages in a practice or policy that has breached the putative class members' mortgage modification agreements in the same way. *See Wal-Mart,* 131 S. Ct. at 2553–54; *see also In re Cablevision Consumer Litig.*, 2014 WL 1330546, at *6–7. To mount this hurdle, Parker maintains that BOA systematically determines which mortgage modification agreements are valid and binding; reviews those binding agreements for errors; and, if certain errors are found, refuses to execute the terms of those agreements to the borrowers' detriment. (*See* Pl.'s Mem. at 33.) However, as explained fully below, this Court finds that Parker has not provided sufficient proof that BOA has any such policy or practice. Thus, Parker has failed to satisfy Rule 23(a)'s commonality mandate, and for this reason alone, Parker's certification motion must fail.

### A. Parker Has Failed To Satisfy The Commonality Requirement Of Rule 23(a)

To understand Parker's commonality contentions—and why they are deficient—it is important to note that Parker primarily relies on the following three fact-based arguments and related evidence to demonstrate commonality for the purpose of Rule 23(a): (1) he maintains that BOA's modification agreements are essentially standard form contracts that do not differ materially from one another and thus do not require individualized review (*see* Pl.'s Mem. at 37–38); (2) he argues that BOA consistently engages in the practice of identifying borrowers who have valid and enforceable modification agreements by coding their files as "Completed" (*see id.* at 28, 33); and (3) he contends that BOA systematically reviews the "Completed" mortgage modification files and intentionally refrains from effectuating the terms of these binding modification agreements if errors are detected, in breach of the borrowers' contracts (*see id.* at 34–36). This Court has examined the record evidence related to each of these prongs of Parker's commonality argument, and for the reasons explained below, it has

determined that Parker's contention that BOA has a policy or practice of subjecting borrowers with valid modification contracts to additional scrutiny and of systematically breaching those contracts in a manner that causes identical harm to members of the putative class is insufficiently supported.  (*Id.*)

       1.     <u>Parker Has Not Shown That BOA Uses A Small Number Of Substantially Similar Standard Form Modification Contracts</u>

     Class certification motions brought against mortgage servicers alleging breach of contract are regularly denied for lack of commonality when the underlying claims turn on the classwide interpretation of a large number of mortgage agreements.  *See, e.g.*, *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 542–43 (C.D. Cal. 2013); *Campusano v. BAC Home Loans Servicing LP*, No. 11-cv-4609, 2013 WL 2302676, at *5–6 (C.D. Cal. Apr. 29, 2013).  This is so because the terms of mortgage agreements tend to vary across borrowers, making it difficult to determine "in one stroke" whether a defendant's actions have resulted in the breach of every class member's contract.  *Wal-Mart*, 131 S. Ct. at 2551.  To be sure, a class action may still satisfy the commonality requirement if the material terms of the disputed agreements are essentially identical across all class members.  *See In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*, MDL No. 10-2193, 2013 WL 4759649, at *4 (D. Mass. Sept. 4, 2013); *Gaudin v. Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417, 424–25 (N.D. Cal. 2013); *see also Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010) ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment.").  However, the plaintiff who seeks class action certification of a breach of contract claim bears the burden of establishing that there are no material

variations in the class members' agreements.  *See Campusano*, 2013 WL 2302676, at *5–6.

Given the importance of uniform contract terms to the classwide resolution of a breach of contract action, it is not surprising that Parker asserts here that BOA relies on a limited number of standard form contracts when it enters into an agreement to modify the terms of a borrower's mortgage.  (Pl.'s Mem. at 37–38.)  To support this allegation, Parker has submitted a "voluminous" number of "pre-printed, form agreements" that he purportedly obtained through discovery.  (*Id.* at 38; *see also* Exs. 28–39 to Pl.'s Mot., ECF No. 60-34–60-45.)[8]  BOA argues that the contracts Parker points to are hardly "standard" in form (Def.'s Opp'n at 33), and indeed, this Court finds that even the most cursory review of the thousands of pages that Parker has offered reveals significant variations between the templates (*compare, e.g.*, Ex. 36 to Pl.'s Mot., ECF No. 60-42, at 221 (containing requirement that borrowers certify that they are suffering financial hardship), *with* Ex. 35 to Pl.'s Mot., ECF No. 60-41, at 124 (containing no requirement that borrowers certify that they are suffering financial hardship)).

Moreover, and perhaps most significantly for present purposes, not only do BOA's mortgage modification contract templates vary, they also appear to contain a wide variety of conditions precedent to the formation of a valid agreement—*i.e.*, conditions that "must occur, unless [their] non-occurrence is excused, before performance under a contract becomes due."  Restatement (Second) of Contracts § 224 (1981).  Where a contract contains a condition precedent, the offer and an acceptance alone are not enough for the agreement to be valid and take effect; the condition precedent must also be satisfied.  And, here, those conditions vary widely—for

---

[8] Although neither party details the precise number of form modification agreements contained in these exhibits, Parker's submission totals well over 2,500 pages.

example, some of the templates require that the borrower undergo an income verification process before the modification agreement becomes binding. (*See, e.g.*, Ex. 34 to Pl.'s Mot., ECF No. 60-40, at 149 ("Please note that this offer is contingent upon verification of your income.").)  Others require that the borrower submit further documentation.  (*See e.g.*, Ex. 35 to Pl.'s Mot. at 119 ("This offer is contingent on . . . [a c]opy of your most recent supporting income receipts (pay stubs)[.]")  Still others condition implementation of the modification agreement on BOA countersigning the contract after the borrower returns it.  (*See, e.g.*, Ex. 37 to Pl.'s Mot., ECF No. 60-43, at 75 ("This modification agreement will not be binding or effective unless and until it has been signed by both you and [BOA].").)  And some, like Parker's own mortgage modification agreement, do not contain any of these preconditions.  (*See* Ex. 7 to Pl.'s Mot.)

Thus, rather than supporting Parker's assertion that certification is appropriate because BOA utilizes various standard form contracts when it reaches mortgage modification agreements with borrowers, "[t]he sheer number of [different] form contracts at issue here counsels against certification" of Parker's breach of contract action. *Gustafson*, 294 F.R.D. at 542.  Put another way, this Court finds that, with respect to Parker's burden of demonstrating commonality, the form contracts here don't help, because there really is no difference between the wide variety of form contracts that BOA uses for modification agreements (which likely would still need to be reviewed individually to determine which terms apply to various members of the class) and individually-tailored, non-form contracts (which typically are not amenable to class certification treatment).  *See id.*  Consequently, to the extent that Parker is seeking to satisfy Rule 23(a)'s commonality requirement by making an initial showing that the

24

contracts of the putative class members have no significant variations that would require individualized review of each agreement, Parker's effort fails.

　　　　2.　　Parker Has Not Shown That The "Completed" Designation Indicates The Existence Of A Valid, Binding Modification Agreement

In order for Parker to provide the requisite significant proof that the putative class members have been injured as a result of BOA's systematic breach of valid modification agreements, it must first be established that each member of the class actually *had* a valid modification agreement, which is a formidable task in light of the prior discussion regarding the variation among BOA's mortgage modification offers. Undaunted, Parker maintains that the existence of a valid, binding contract (a prerequisite to any breach of contract action) can easily be ascertained on a classwide basis under the circumstances presented here based on BOA's alleged practice of coding a borrower's file as "Completed" once a borrower has returned a signed modification agreement and after any conditions to the formation of a valid contract have been satisfied.  In other words, according to Parker, the fact that members of the putative class may have had different form contracts containing various conditions precedent such that their modification agreements became valid and binding at potentially different times is no impediment to class action treatment because BOA "uses the term 'Completed' to show that the parties have reached a binding agreement" (Pl.'s Mem. at 28), and the "Completed" designation is only made in BOA's internal systems when a borrower has no other obligation than "paying on time and in full" (*id.* at 97).  BOA responds that the "Completed" designation indicates nothing more than that the borrower has properly returned the modification agreement (Def.'s Opp'n at 18–19), and this Court has little trouble concluding that the record does not support

Parker's contentions regarding the significance of the "Completed" designation for several reasons.

First of all, Parker's primary evidence for the proposition that the "Completed" designation indicates the existence of a valid, binding contract is a document that says no such thing when it is considered as a whole and in context.  The document—which is entitled "Loan Modification Master Procedure" and dated November 24, 2009—appears to be an instruction guide of sorts for the BOA employees who process loan modification agreements.  (*See* Ex. 20 to Pl.'s Mot.; *see also* Pl.'s Mem. at 28.)  The document itself states that a file is to be coded "Completed" when a modification agreement has been returned to BOA and BOA determines that the agreement "is properly signed, dated, and notarized[.]"  (Ex. 20 to Pl.'s Mot. at 33.)  Parker primarily relies on the fact that the Master Procedure document also contains a glossary in which the term "Completed" is defined more broadly:  "[f]iles that have accepted an offer, a decision has been made, agreed by all parties and correctly executed documents have been returned by the customer."  (*Id.* at 46; *see also* Pl.'s Mem. at 28.)  But that glossary definition says nothing about whether all conditions precedent must have been satisfied by the time a file is coded as "Completed."  And even setting aside the fact that the glossary definition fails to convey that "Completed" necessarily means that a binding contract has been reached, it is not at all clear how the glossary relates to the underlying Master Procedure document, given that a number of words that the glossary purports to define (such as "Decisioned," "Rejected," and "Qualified") appear nowhere in the record copy of the Master Procedure document.

What is more, even if it was clear that the glossary's definition of "Completed" referenced and related to the database code discussed in the Master Procedure

document, there is no dispute that less than one week after BOA issued the Master

Procedure document, BOA issued a *revised* version that was identical to the prior

document in every respect *except* for the fact that it did not include the glossary.  (*See*

Ex. 14 to Def.'s Opp'n, ECF No. 63-35.)  Then, just six months later, BOA issued

another revised version of the same Master Procedure document—and this version not

only lacked the glossary, it also clearly stated that "Completed" means "that the

[borrower] successfully returned the agreement" period—*i.e.*, without any reference to

offer and acceptance.  (Ex. 15 to Def.'s Opp'n at 19.)  Thus, Parker's reliance on the

2009 glossary definition of "Completed" is clearly misplaced:  the glossary is not only

internally ambiguous, it was also essentially repealed less than a week after it was

issued, and Parker has not shown that that same "Completed" definition was ever again

in effect throughout the class period.

Second, the record testimony regarding the meaning of the "Completed"

designation simply does not support Parker's version of how BOA used that term in

processing modification agreements.  For example, BOA has offered an affidavit from

Michael Sunlin, a BOA Vice President whose department specializes in locating and

extracting data from BOA's databases, in which Sunlin testifies that "Completed"

indicates only that the borrower has signed and returned a modification agreement and

does "not [reflect] that the loan can or should immediately be returned to normal

servicing."  (Ex. 3 to Def.'s Opp'n, ECF No. 63-24, ¶ 6.)  And the purportedly

contrasting deposition testimony that Parker points to—specifically, deposition

testimony from Charles Kelly, a BOA senior vice president acting as a corporate

representative for BOA under Federal Rule of Civil Procedure 30(b)(6) (*see* Pl.'s Mem.

at 28)—is not to the contrary.  Although Kelly does state that modification agreements

27

such as Parker's are "not complete until all parties agree to the terms" (*id.*; *see also*

Dep. of Charles Kelly ("Kelly Dep."), Ex. 21 to Pl.'s Motion, ECF No. 60-27, at 96:19–

20), there is no indication from the question presented or otherwise that Kelly is

discussing the meaning of BOA's "Completed" designation.  Regardless, when Kelly's

statements are considered in context, it is clear that Kelly used the term "complete" to

indicate that the parties have *agreed* to the terms of the modification agreement; he is

not asserting that the files BOA marks "Completed" are those in which all of the

conditions have been satisfied and a binding contract exists.[9]

Finally, to the extent that Parker is suggesting that the evidence shows that the

fulfillment of the conditions precedent to a binding modification agreement (such as

income verification and a countersignature) necessarily occurs prior to the "Completed"

designation—and thus one can infer that all such conditions have been deemed satisfied

and the parties have a binding agreement when the "Completed" designation is made—

Parker is mistaken.  For example, Parker relies primarily on deposition testimony to

establish that the borrower's income is verified prior to BOA coding his file as

"Completed."  (Pl.'s Reply at 11–12.)  However, nearly every deponent who references

income verification does so in the context of *qualifying* for a mortgage modification in

the first place, not in the context of BOA's review of an already-approved modification

---

[9] Parker has moved to have Sunlin's testimony stricken on the grounds that it contradicts the deposition
testimony of Kelly and of certain other BOA employees and therefore implicates the sham affidavit
doctrine.  (*See* Pl.'s Mem. in Supp. of Pl.'s Mot. to Strike Sunlin, ECF No. 78, at 6–7, 15–18.)  Parker
has not established that the sham affidavit doctrine—which is clearly tied to the legal standard for
summary judgment—applies in the context of class certification.  *See In re Front Loading Washing
Mach. Class Action Litig.*, No. 08-51, 2013 WL 3466821, at *9 (D.N.J. July 10, 2013); *see also
Raymond v. Architect of Capitol*, No. 11-CV-01088, 2014 WL 2810642, at *2 n.5 (D.D.C. June 23,
2014) (internal quotation marks and citations omitted) ("The sham affidavit rule precludes a party from
creating an issue of material fact by contradicting prior sworn testimony unless the shifting party can
offer persuasive reasons for believing the supposed correction is more accurate than the prior
testimony.").  Moreover and in any event, this Court concludes that nothing in Sunlin's affidavit is
inconsistent with the deposition testimony of other BOA employees, as discussed here and *infra*.
Accordingly, Parker's [78] motion to strike has been **DENIED**.

28

offer.  (*See, e.g.*, Kelly Dep. at 36:4–8; Dep. of Suzanne Haumesser ("Haumesser Dep."), Ex. 22 to Pl.'s Mot., ECF No. 60-28, at 17:4–18:4.)  And the one deponent who does mention income verification in the context of a borrower returning a signed modification agreement says nothing about whether this condition must be satisfied before a borrower's file is coded as "Completed."  (*See* Goodrum Dep. at 20:13–16.)

Nor has Parker shown that the "Completed" designation itself satisfies the countersignature requirement (where such a condition exists) and thus necessarily indicates that a binding modification agreement is in effect once that designation is made.  BOA points to four different clauses contained within various modification agreements that require the bank's countersignature before they go into effect.  For example, one form agreement states that "[t]his modification agreement will not be binding or effective unless and until it has been signed by both" the borrower and Bank of America (Ex. 37 to Pl.'s Mot., at 75), while another agreement requires a borrower to attest that "I understand that the Loan Documents will not be modified unless and until . . . the Lender accepts this Agreement by signing and returning a copy of it to me" (Ex. 29 to Pl.'s Mot., ECF No. 60-35, at 206).  To avoid the implications of this countersignature condition on his argument that "Completed" signifies a binding contract, Parker argues that Bank of America uses the "Completed" designation instead of a physical signature as its way of countersigning modification agreements and satisfying any countersignature requirement.  (*See* Pl.'s Reply at 16–17.)  But it is well established that an electronic signature such as a database code cannot constitute a valid signature unless the signing party *intends* for the "electronic sound, symbol, or process" to constitute a signature, Unif. Elec. Transactions Act § 2(8) (1999); *see also* Restatement (Second) of Contracts § 134; 10 Williston on Contracts § 29:36 (4th ed.

2011), and Parker gives this Court no basis for concluding that BOA intended the coding of a borrower's file as "Completed" to serve as a countersignature, and, indeed, indicates to the contrary.  (*See* Pl.'s Mem. at 72 (admitting that "the evidence suggests that [BOA] does not consider the loan modification contracts as binding until [the Post Loan Modification Review] ha[s] run [its] course").)

The bottom line is this:  although Parker struggles valiantly to advance his own interpretation of BOA's "Completed" designation in an attempt to satisfy his burden of providing significant proof that BOA has a systematic policy or practice that harmed all class members in the same way, Parker has not demonstrated that BOA has any sort of consistent internal process for determining that a valid modification agreement has been reached, much less that the "Completed" designation properly identifies those borrowers who have binding modification agreements as a matter of law.  Therefore, Parker has not shown that this Court can, in one stroke, determine that each class member has a binding modification agreement that BOA then systematically breached.

3.     Parker Has Not Offered Significant Proof That BOA Conducts Any "Post Loan Modification Review" That Results In Systematic Breach Of Valid Modification Agreements

The crux of a classwide breach of contract claim is, of course, the assertion that the defendant engaged in conduct that amounts to a systematic violation of the terms of the class members' binding contractual agreements.  *See, e.g.*, *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 192 (D.D.C. 2011) (certifying settlement class where bank systematically imposed improper overdraft fees).  Here, Parker insists that his breach of contract and tortious interference with contract claims raise questions of law and fact that are common to all members of the putative class because a factfinder could conclude that the mortgage modification agreements of all of the putative class members were breached in the same way—specifically, as a result of the additional

inappropriate scrutiny that BOA allegedly applies once a valid modification agreement is entered into (the so-called "Post Loan Modification Review").  However, Parker has done little to establish that BOA actually engages in any systematic post-modification review process with respect to valid and binding modification agreements, and this failure, too, dooms Parker's quest to satisfy Rule 23(a)'s commonality element.

Parker's view of BOA's loan modification review process is explained fully above, *see* Part I.C.2, *supra*; suffice it to say here that, by Parker's telling, BOA has a policy or practice whereby binding loan modification agreements are reviewed for errors and BOA determines whether or not to proceed with implementing the terms of those contracts.  And if BOA does, in fact, systematically place binding loan modification agreements that have been designated "Completed" into this critical "Review" phase, as Parker alleges, then one would certainly and reasonably expect that the details of such a review procedure would be memorialized in writing to ensure consistent application or would at least be made clear to those who are tasked with assessing and implementing BOA's mortgage modification contracts.  But Parker has not offered a single internal BOA document that describes or references any such review process, or that otherwise proves its existence, let alone any significant proof that BOA consistently applied such policy to the putative class members' modification agreements, as the commonality element requires.  Rather, Parker mentions only two allegedly supporting documents in the section of his certification motion that addresses BOA's "systems and practices in servicing loan modifications" (Pl.'s Mem. at 33), and neither says anything about an automatic or systematic review of binding modification agreements.[10]

---

[10] BOA's "Loan Modification Overview" (Ex 24 to Pl.'s Mot., ECF No. 60-30), states only the obvious—that "loan mod[ification] documentation can be calculated incorrectly" (*id.* at 2)—which by

The deposition testimony that Parker points to is also devoid of any statements that establish the general modification review practice that Parker describes.  In this regard, Parker primarily relies on the testimony of Lourdes Duarte, an operations team manager at BOA and Rule 30(b)(6) deponent, and John Goodrum, a unit manager who interacted with Parker in the course of Parker's attempts to have BOA implement his modification agreement.  (*See* Pl.'s Mem. at 33–36.)  However, when these deponents' testimony is read closely and in context, it is clear that neither actually supports Parker's vision of a post-modification review process to which valid and binding modification agreements are systematically subjected.

For example, Duarte describes a process whereby modification agreements are "reviewed by the closing team" in order to determine whether a modification agreement is "valid" and complies with applicable requirements.  (Dep. of Lourdes Duarte ("Duarte Dep."), Ex. 23 to Pl.'s Mot., ECF No. 60-29, at 43:10–12, 43:22–25.)  According to Duarte, the closing team will ensure that a modification agreement has been properly signed and returned on time (*id.* at 44:15–19); that nothing "within the loan" has changed (*id.* at 78:8–9); and that the terms of the modification agreement satisfy requirements such as the noteholder's rules (*id.* at 78:8–10).  Duarte also states that, upon finishing this review, the closing team will "complete [the modification] with an approval or a decline."  (*Id.* at 43:13–14.)  Goodrum describes a somewhat similar process whereby a modification agreement is sent to BOA's closing team "once the modification documents are returned."  (Goodrum Dep. at 74:6–7.)  Goodrum admits that he has not personally participated in the closing process (*see id.* at 75:1–2, 75:8–9),

---

no means supports the contention that BOA actively or systematically searches for errors after it reaches binding agreements with borrowers.  Likewise, the "Modification Correction Template" (Ex. 25 to Pl.'s Mot., ECF No. 60-31), provides merely one example of one possible solution if an error is made at some point in the modification process.

but it is his understanding that the closing team is responsible for reviewing the modification documents that a borrower returns to ensure that everything is in order (*id.* at 74:13–21), and the closing team's review involves such steps as making sure that the various terms and conditions contained in the proposed modification agreement are accurate (*id.* at 75:2–8) and that the agreement complies with noteholder rules (*id.* at 75:14–16).[11]

With respect to Parker's burden of establishing the existence of the allegedly improper Post Loan Modification Review procedure, what is missing from both Duarte's and Goodrum's testimony is any indication that the "closing" process occurs *after* valid and binding modification agreements have been reached, as Parker contends. To the contrary, Duarte states that part of the closing process entails reviewing returned modification documents to ensure that they have been properly executed (Duarte Dep. at 44:14–18), which necessarily means that the closing team is actively involved in evaluating the returned modification materials prior to the formation of a binding modification contract.  Similarly, Duarte explains that it is the closing team that "complete[s] the modification," and that a modification agreement is not deemed "valid" until the closing team determines that the documents that BOA receives from the borrower comply with the applicable requirements (*id.* at 43:8–14)—a determination that appears to be part of the contract formation process rather than a post-hoc procedure designed to undermine the modification agreement.  Goodrum's testimony

---

[11] BOA's brief explains that such a closing process is required even after a modification offer has been tendered and the borrower has returned related documents because changing a mortgage agreement is a complex endeavor in which "[e]rrors will inevitably arise[.]"  (Def.'s Opp'n at 20.)  BOA claims that, contrary to Parker's suggestion, these errors are not merely BOA's own errors but also include borrower errors such as a failure to properly keep up with current monthly mortgage loan payments.  (*Id.*)  "Closing" is designed to "find those errors and address them" prior to finalizing the terms of the modification agreement.  (*Id.*)  To this extent, then, BOA's argument is that "closing" is *part* of the process of forming a binding agreement to modify the terms of a mortgage loan.

also strongly suggests that the closing process occurs, at least in part, prior to contract formation.  (*See* Goodrum Dep. at 74:6–7 (explaining that closing occurs when a borrower returns the modification agreement).)  Thus, Duarte's and Goodrum's statements do not constitute significant proof that BOA subjects already valid and binding modification agreements to a Post Loan Modification Review process, as Parker maintains.[12]

Parker has also failed to establish that BOA's "closing" process is a uniform and systematic procedure.  In this regard, Parker again relies entirely on the testimony of Duarte and Goodrum (*see* Pl.'s Mem. at 33), and once again the proffered testimony falls short.  For example, Duarte speaks only of what the closing team "could" do as part of its review (Duarte Dep. at 44:12–13), which clearly indicates that the substance of any review can vary.  For his part, Goodrum avers that he does not have any knowledge of the specifics of the closing process (Goodrum Dep. at 75:1–2, 75:8–9), and Laurence Reichenbach, an Operations Project Manager at BOA, expressly denies that BOA conducts any sort of systematic, uniform review.  (*See* Ex. 4 to Def.'s Opp'n, ECF No. 63-25, ¶ 2.)

At the end of the day, this Court has come to the conclusion that the picture of a systematic and injurious post-modification review process that Parker attempts to paint in his motion for class certification appears in the record only in the broadest of strokes, and is based solely on snippets of deposition testimony that Parker's certification

---

[12] If Parker is also attempting to rely on the deposition testimony of Suzanne Haumesser—another BOA employee and Rule 30(b)(6) deponent (*see* Pl.'s Mem. at 33–36)—this Court does not know why, because as far as this Court can tell, Haumesser does not refer to any sort of review of returned modification agreements at all.  Instead, the Haumesser testimony that Parker cites describes BOA's process of returning a borrower's file to normal servicing by changing a borrower's "Warning Code" to "0."  (*See* Haumesser Dep. at 107:12–18.)  And although this process of a return to normal servicing is one part of Parker's broader narrative, Haumesser's testimony in no way relates to Parker's description of BOA's Post Loan Modification Review.

motion extracts and embellishes.  There are no internal BOA documents that definitively establish any such process, and the deponents' full statements bear little resemblance to the contentions that their testimony purportedly supports.  Put another way, while Parker's depiction of the systematic manner in which BOA undertakes to breach binding loan modification agreements is bold, vibrant, and compelling, the record evidence shows only the faintest traces of any systematic review of modification terms, and it is entirely unclear both as to when, exactly, BOA's supposed Post Loan Modification Review occurs or what, if anything, it entails.  Consequently, Parker has failed to provide significant proof that BOA engages in a uniform, systematic review of binding modification agreements that would support a finding of commonality in satisfaction of the Rule 23(a) requirement under the Supreme Court's *Wal-Mart* standard.

**B.     This Court Need Not Address The Other Class Action Certification Requirements, Nor Must It Reach The Parties' Evidentiary Motions**

It is clear beyond cavil that the "[f]ailure to meet any of Rule 23(a) or 23(b)'s requirements precludes certification."  *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 147 (3d Cir. 2008); *accord In re LifeUSA Holding Inc.*, 242 F.3d 136, 147 (3d Cir. 2001); *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993).  This means that, having determined that Parker has failed to satisfy the essential prerequisite of commonality, this Court need not proceed to address each of the other certification requirements.  *See Wal-Mart*, 131 S. Ct. at 2551 n.5 ("In light of our disposition of the commonality question, however, it is unnecessary to resolve whether respondents have satisfied the typicality and adequate-representation requirements of Rule 23(a)."); *see also Eastman v. First Data Corp.*, 292 F.R.D. 181, 190 (D.N.J.) ("Because of the lack of commonality, the Court need not reach the other Rule 23(a) questions of typicality

and adequacy of representation or Rule 23(b).”); *Cook v. Boorstin*, 38 Fed. R. Serv. 2d 837 (D.D.C. 1983) (“In the present case, the Court need not reach the issues of numerosity, commonality, and adequacy-of-representation, as the resolution of the question of typicality prevents the certification of a class action.”).

 This Court also need not decide the remaining evidentiary motions that the parties have filed with respect to the four expert witnesses they have collectively commissioned to support arguments related to other aspects of the class certification question.  BOA seeks to strike the testimony of Parker’s three expert witnesses, who have testified regarding the identification of class members, calculation of damages arising out of late fees, and calculation of damages arising out of false credit reports (*see* Def.’s Mot. to Strike the Purported Expert Witness Reports of Keshav Raghunathan, Mark Riley, and Dean Binder, ECF No. 67), while Parker seeks to strike the testimony of a rebuttal  expert witness that BOA has procured to discredit Parker’s expert testimony (*see* Pl.’s Mot. In Limine to Exclude Test. of David Skanderson, ECF No. 79).  None of these four expert witnesses speaks to the commonality inquiry, which means that their testimony is not relevant to the instant denial of class certification and the parties objections can be set aside as moot.  Nevertheless, to the extent that the parties might somehow seek to rely upon this expert testimony in the context of Parker’s individual claim, the evidentiary motions have been denied without prejudice to raising these objections again.

## IV. CONCLUSION

 For the reasons explained in this Memorandum Opinion, the Court has issued an order denying Parker’s motion for class certification.  Parker can proceed to litigate the issue of whether BOA breached or tortuously interfered with his *own* mortgage

modification agreement, but Parker has not provided significant proof of the existence of a general policy or practice on the part of BOA that resulted in the systematic breach of, or tortious interference with, the modification agreements of other borrowers.  The Supreme Court requires such a showing after *Wal-Mart*, and without it, Parker cannot satisfy the commonality requirement of Rule 23(a).


DATE:  April 16, 2015                              *Ketanji Brown Jackson*
                                                  KETANJI BROWN JACKSON
                                                  United States District Judge